**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

v.

DALONTE HARRISON,

      Defendant.

Crim. No. 25-00187 (EGS)

<u>**MEMORNDUM OPINION**</u>

On July 14, 2025, the Court held a hearing ("July 14, 2025 Hearing" or "Hearing") on Defendant Dalonte Harrison's ("Mr. Harrison") Motion for Reconsideration and Memorandum in Support of Pretrial Release ("Motion"). *See* Def.'s Mot. for Recons. & Mem. in Support of Pretrial Release ("Mot."), ECF No. 14; Minute Entry (July 14, 2025).[1] Mr. Harrison is charged with one count of Unlawful Possession of a Firearm and Ammunition by a Person Previously Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1). *See* Indictment, ECF No. 10. The government sought pretrial detention, and the magistrate judge who previously considered the matter granted the government's request. *See* Gov't Mem. in Support of Pretrial Detention, ECF No. 5; Order of Detention

---

[1] When citing electronic filings throughout this Opinion, the Court cites to the ECF header page number, not the page number of the filed document.

Pending Trial, ECF No. 17. Mr. Harrison sought reconsideration of the decision to detain him before this Court, *see* Mot., ECF No. 14; and the government again opposed pretrial release, *see* Gov't Opp'n to Def's Mot. for Recons. of Pretrial Release ("Opp'n"), ECF No. 15.

At the conclusion of the Hearing, and after careful consideration of the Motion, the Opposition thereto, the letters in support of Mr. Harrison, the magistrate judge's detention decision, the parties' arguments, and the entire record, the Court granted the Motion and released Mr. Harrison to the High Intensity Supervision Program, imposing strict conditions. *See* Conditions of Release, ECF No. 18. The Court concluded that because the strict conditions set can adequately protect against the risk of flight and threat to the community, release is required under the Bail Reform Act ("BRA"). *See* 18 U.S.C. § 3142. Although a written decision is not required under 18 U.S.C. § 3142(h), the Court memorializes its ruling at the Hearing and explanation thereof in this memorandum opinion.

## I.   Background

### A. Factual Background

#### 1. Mr. Harrison

Mr. Harrison is a 32-year-old man who has lived in Washington, D.C. or Prince George's County, Maryland for his entire life. *See* Mot., ECF No. 14 at 5. He is a father who is

2

close with his family, including his children, mother, grandmothers, and nieces. *See* Mot., ECF No. 14 at 5 (citing Letters in Support, ECF No. 6-1); *see also* Letter from Rodriguez Norman, ECF No. 6-3. He lives with his grandmother; his fiancé, who is approximately five months pregnant; and their nine-year-old son. *See* Mot., ECF No. 14 at 5 (citing Letter from Rai Mitchell, ECF No. 6-2).

According to Mr. Rodriguez Norman ("Mr. Norman"), Supervisor of Cure the Streets, a program with the National Association for the Advancement of Returning Citizens ("N.A.A.R.C."), Mr. Harrison "recently completed the Pathways Program, a comprehensive 16-week initiative facilitated by the Office of Neighborhood Safety and Engagement (O.N.S.E.) for individuals identified as high risk." Letter from Rodriguez Norman, ECF No. 6-3. The Pathways Program provides "job readiness training, mental health support, Cognitive Behavioral Theory (CBT), and professional development including interviewing techniques." *Id.* Mr. Norman reports that Mr. Harrison "not only fulfilled all program requirements but excelled—earning employment opportunities and obtaining IT certifications, which reflect his commitment to long-term change and stability." *Id.*

Mr. Norman elaborated on how Mr. Harrison worked to better his community as part of this program. *Id.* Specifically, he

described how "Mr. Harrison has contributed his time and energy to Cure the Streets, a violence interruption program out of the [District of Columbia] Office of the Attorney General." *Id.* For example, Mr. Harrison "assisted with canvassing efforts in the Congress Park neighborhood, played a key role in setting up and breaking down community events, and has participated in mediating conflicts involving high-risk youth." *Id.* Mr. Norman states that this work by Mr. Harrison "has been instrumental in promoting peace and community engagement in areas that need it most." *Id.* In summary, Mr. Norman described Mr. Harrison as a "young man who has demonstrated both personal growth and a sincere commitment to improving his life and the well-being of his community" who is "not only working toward bettering his own life but also actively working to uplift those around him." *Id.*

At the July 14, 2025 Hearing, Mr. Harrison's counsel represented that Mr. Harrison has now been offered employment. Mr. Harrison's job was scheduled to begin on July 21, 2025, and would be five hours per day for the first month, and then transition to full-time employment after that. Moreover, Mr. Vincent Massey ("Mr. Massey"), Executive Director and Founder of What a Change, Massey Mentoring, Inc. attended the Hearing and offered to provide his mentorship resources to Mr. Harrison. Mr. Massey's not-for-profit organization "provides mentoring to teens and men in Washington, DC who are on parole and probation

to reduce the likelihood of their return to incarceration and make them productive citizens who can positively impact their families and communities." WHAT A CHANGE, MASSEY MENTORING, INC., https://www.whatachange.org/vincent-m-v (last visited July 28, 2025).

### 2. Prior Offenses

Although he has not had any convictions in the last decade[2], Mr. Harrison committed several offenses when he was a teenager or emerging adult. *See* Opp'n, ECF No. 15 at 13–14. The government highlights four offenses charged against Mr. Harrison in the D.C. Superior Court in 2011 and 2012. *See id.* These offenses began with an Unlawful Entry charge, of which Mr. Harrison was ultimately convicted, and led to Mr. Harrison being charged with and convicted of failures to appear. *See* Opp'n, ECF No. 15 at 13–14 (citing D.C. Superior Court Case Nos. 2011 CMD 016887; 2011 CMD 022066; 2012 CMD 003158; 2012 CMD 013849).[3]

---

[2] The government erroneously stated in its Opposition that "[o]n January 22, 2025, [Mr.] Harrison was convicted in Prince George's County, Maryland of Transporting a Handgun on a Roadway, and sentenced to a three-year sentence, two of which were suspended." Opp'n, ECF No. 15 at 13. This prior proceeding did not occur in 2025; it occurred in 2014-2015. Mr. Harrison apparently pled guilty to this offense on November 7, 2014 then was sentenced on January 22, 2015. *See* Dkt. in *Maryland v. Harrison*, Case No. CT141105X (Cir. Ct. 2014-15).
[3] These cases pertain to Mr. Demetrius Kavon Blair, which is, according to the Pretrial Services Agency, an alias for Mr. Harrison. *See* Pretrial Servs. Report, ECF No. 4.

According to the records from these offenses, Mr. Harrison did not succeed on supervision.

Shortly afterwards, Mr. Harrison committed an offense in Maryland that is the predicate charge for the government charging him with violating 18 U.S.C. § 922(g)(1) in this case. On August 29, 2014, Mr. Harrison had an initial appearance in the Circuit Court for Prince George's County, Maryland. *See* Dkt. in *Maryland v. Harrison*, Case No. CT141105X (Cir. Ct. 2014-15); *see also* Opp'n, ECF No. 15 at 13. He was charged with one count of Transportation of a Handgun on a Roadway, in violation of MD. CRIM. LAW 4-203(A)(1)(II)(t), which is described as a misdemeanor in Maryland, even though it is punishable by a year or more of incarceration. *See* Dkt. in *Maryland v. Harrison*, Case No. CT141105X (Cir. Ct. 2014-15). Mr. Harrison pled guilty and on January 22, 2015 was sentenced to three years of incarceration with two years suspended and three years of supervision. *See id.* The government did not allege in its briefing materials nor at the July 14, 2025 Hearing that Mr. Harrison failed to comply with the supervision conditions imposed in this case. *See also* Pretrial Servs. Report, ECF No. 4 at 3; Add. to Detention Order, ECF No. 17-1 at 3. This 2014 offense was Mr. Harrison's most recent conviction.

In 2017, the government brought a charge against Mr. Harrison in D.C. Superior Court that was ultimately dismissed in

2022 but required Mr. Harrison to be on supervised release during the case's pendency. *See* Mot., ECF No. 14 at 7 (referencing Dkt. in Case No. 2017 CF2 004549 (D.C. Super. Ct.)). Mr. Harrison represents that his supervision was never revoked in that case, *see id.*; and the government conceded this point at the July 14, 2025 Hearing.

### 3. Allegations in Current Case

The events that gave rise to Mr. Harrison's current charge occurred on June 15, 2025. The government alleges that

> shortly after 6:00 p.m., [an unidentified person] called 911 to report that a man with a grey sweatsuit was pointing a gun at people on the 1300 block of Savannah Street SE. According to the caller, there was a fight in the area and a lot of commotion outside. A slim-built [B]lack man who was approximately 5'7" in a grey sweatsuit and a hoodie was pointing a gun at people outside in the alley between 1327 and 1329 Savannah Street SE.

> Officers Finn and Griffin with the Metropolitan Police Department responded to the rear of 1327 Savannah Street SE, and found [Mr.] Harrison in the alley matching the description given by the 911 caller. Although [Mr.] Harrison was standing with a group of people, he was the only one who matched the caller's description. The Officers approached [Mr.] Harrison, and Officer Griffin told [Mr.] Harrison not to bug out, and touched [Mr.] Harrison's waistband as [Mr.] Harrison tried to pull away.

> Officer Griffin felt a gun, and after a brief struggle, the gun was removed from [Mr.] Harrison's waistband and he was placed in handcuffs.

Opp'n, ECF No. 15 at 2-3. The government did not identify the 911 caller nor allege that there was any eyewitness identification of Mr. Harrison as the person who was the subject of the 911 call.

According to the government, Officer Griffin recovered a black 9mm Glock 26 with the serial number BGXE455 and an "auto-sear" device affixed to the rear. *Id.* at 4. The gun had one bullet loaded in the chamber and ten rounds in a magazine capable of holding twelve. *See id.* The government asserts that auto-sear devices allow a gun to be continuously fired. *See id.* The government further alleges that "[a]s Officers rolled [Mr.] Harrison over on the ground and lifted his feet, a second 9mm Glock magazine fell from [Mr.] Harrison and was recovered. This one was capable of holding fifteen rounds, and was loaded with eleven rounds." *Id.* The government also reported that the officers found "9 white round pills labeled T 192 in a clear plastic bag and 3 grams of a white powder-like substance" when they searched Mr. Harrison incident to his arrest. *Id.* at 6.

The government determined that someone other than Mr. Harrison bought the gun at a pawn shop in North Carolina on December 15, 2023. *See id.* at 8. It also conducted a ballistics test and found that the gun was used during an incident on February 17, 2024, during which two individuals shot at a car. *See id.* The government does not allege that Mr. Harrison was

8

involved in this incident, *see id.*, indeed; it conceded at the July 14, 2025 Hearing that it had no evidence tying Mr. Harrison to it. Nor does the government allege how or when the gun came into Mr. Harrison's possession. *See id.*

### B. Procedural Background

On June 15, 2025, Mr. Harrison was charged in D.C. Superior Court with one count of Unlawful Possession of a Firearm (Prior Conviction), in violation of 22 D.C. Code § 4503(a)(1), (b)(1), and one count of Carrying a Pistol Without a License, in violation of 22 D.C. Code § 4504(a)(1). *See* Opp'n, ECF No. 15 at 7; Case No. 2025 CF2 006713 (D.C. Super. Ct.). A judge in D.C. Superior Court held a preliminary hearing at which the judge found probable cause for both charges and detained Mr. Harrison pretrial. *See* Opp'n, ECF No. 15 at 7. Mr. Harrison represented that a hearing to review the D.C. Superior Court's detention decision was scheduled to be held on June 26, 2025, but the government brought charges in this Court before that hearing could occur. *See* Mot., ECF No. 14 at 1–2.

Mr. Harrison had his initial appearance in this court before Magistrate Judge Zia Faruqui on June 24, 2025, after which the government dismissed his case in D.C. Superior Court. *See* Opp'n, ECF No. 15 at 7. Magistrate Judge Moxila Upadhyaya conducted a hearing on the government's request for pretrial detention of Mr. Harrison on June 26, 2025, at which she granted

9

the government's motion and denied Mr. Harrison's request for release. *See* Minute Entry (June 26, 2025). Magistrate Judge Upadhyaya then issued a written order and addendum on July 14, 2025, *nunc pro tunc* to June 26, 2025. *See* Detention Order, ECF No. 17; Add. to Detention Order, ECF No. 17-1. The Pretrial Services Agency ("Pretrial") opposed release and determined that Mr. Harrison was a "Medium" risk level. *See* Pretrial Servs. Report, ECF No. 4.

The government obtained an indictment against Mr. Harrison on July 3, 2025, charging him with one count of violating 18 U.S.C. § 922(g)(1). *See* Indictment, ECF No. 10. Mr. Harrison's case was then randomly assigned to this Court. The Court held a status hearing on July 8, 2025, during which Mr. Harrison's counsel stated that they intended to file a motion for this Court to consider Mr. Harrison's request for pretrial release. The Court set deadlines for briefing and a hearing which, as noted, occurred on July 14, 2025. *See* Minute Entry (July 14, 2025). At the Hearing, no party called any witnesses. In addition to hearing the parties' arguments, the Court also heard the tape of the 911 call, from Pretrial staff about its recommendation for conditions if Mr. Harrison were to be released, and from Mr. Massey about the mentorship services he could provide. At the Hearing's conclusion, the Court granted Mr. Harrison's Motion and set conditions for his pretrial

release. *See* Minute Entry (July 14, 2025); Conditions of
Release, ECF No. 18.

## II.  Standard of Review

'"In our society, liberty is the norm, and detention prior
to trial or without trial is the carefully limited exception."'
*United States v. Munchel*, 991 F.3d 1273, 1279 (D.C. Cir. 2021)
(quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987));
*see also Stack v. Boyle*, 342 U.S. 1, 4 (1951) ("Th[e]
traditional right to freedom before conviction permits the
unhampered preparation of a defense, and serves to prevent the
infliction of punishment prior to conviction."). As such, "[t]he
Bail Reform Act carefully limits the circumstances under which
detention may be sought to the most serious of crimes." *Salerno*,
481 U.S. at 747.

To deprive someone of their liberty prior to trial, the
government bears the burden of showing that no condition or
combination of conditions can mitigate their risk of flight,
based on a preponderance of the evidence, or danger to the
community, based on clear and convincing evidence. *See Munchel*,
919 F.3d at 1279-80; 18 U.S.C. § 3412(f) (articulating clear and
convincing evidence standard for dangerousness determination);
*United States v. Vasquez-Benitez*, 919 F.3d 546, 551 (D.C. Cir.
2019) (citing *United States v. Vortis*, 785 F.2d 327, 328-29
(D.C. Cir. 1986) (per curiam) (articulating preponderance

11

standard for risk of flight)). "[I]n determining whether there are conditions of release that will reasonably assure the appearance of the person . . . and the safety of . . . the community", *see* 18 U.S.C. § 3142(g), courts consider four factors "(1) the nature and circumstances of the offense charged, (2) the weight of the evidence against the person, (3) the history and characteristics of the person, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release", *see Munchel*, 991 F.3d at 1279 (internal quotations omitted).

A district court reviews a magistrate judge's determination of release or detention *de novo*. *See e.g.*, *United States v. Blackson*, Case No. 23-CR-25, 2023 WL 1778194, at *5 (D.D.C. Feb. 6, 2023) (quotations & citations omitted) (noting how even though "[n]either 18 U.S.C. § 3142 nor § 3145 specifies the standard of review to be applied by a district court reviewing a magistrate judge's release or detention order, and the D.C. Circuit has not squarely decided the issue . . . both the BRA and the Federal Magistrates Act . . . support the conclusion, reached by every circuit to have considered the question, that a district court reviews a magistrate judge's release or detention order *de novo*").

### III. Analysis

#### A. Pretrial Release or Detention and the Bail Reform Act

As noted, the Supreme Court has made clear that pretrial release and the preservation of a person's liberty is to be the norm; detention is only warranted for "arrestees charged with serious felonies" who are found to pose a risk of flight or threat to the community that "no condition of release can dispel." *Salerno*, 481 U.S. 755; *see also Stack*, 342 U.S. at 4 ("Unless th[e] right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning."). In his Motion, Mr. Harrison pointed to statistics from the Administrative Office of the U.S. Courts which show that "nearly everyone released pending trial appears in court and does not reoffend." *See* Mot., ECF No. 14 at 9–10 n. 1 (citing AO Table H-15 (Dec. 31, 2019), *available at* Mot. for Bond, *United States v. Rodriguez*, No. 19-CR-77 (E.D. Wis. Apr. 2, 2020), ECF No. 41, Ex. 1, archived at https://perma.cc/LYG4-AX4H (showing a nationwide failure-to-appear rate of 1.2% and a rearrest rate of 1.9%)).[4] Even with the

---

[4] The Court takes Judicial Notice of the most recent Pretrial Services Violations Summary Report which is "For the 12-Month Period Ending September 30, 2024" and shows similar numbers for rearrest violations (1,234 out of 51,606 cases that were in "Release Status", 8,434 of which had violations, with 7,703 being "technical violations"). *See* U.S. District Courts --- Pretrial Services Violations Summary Report For the 12-month Period Ending September 30, 2024,

plain language of the BRA, clear guidance from the Supreme Court, and federal judicial records showing low rates of individuals who are released on conditions committing offenses or failing to appear during their release, a significant majority of federal defendants are detained pending their trial. *See United States v. Abass*, No. 25-CR-0079, 2025 WL 1096795, at *5 n.2 (D.D.C. Apr. 11, 2025) (citing Alison Siegler et al., *Freedom Denied: How the Culture of Detention Created a Federal Jailing Crisis*, UNIV. CHI. L. SCH. FED. CRIM. JUST. CLINIC 1, 20–22 (Oct. 2022), https://freedomdenied.law.uchicago.edu/report ("Between 1983—the year before Congress enacted the Bail Reform Act—and 2019, federal pretrial incarceration rates skyrocketed from less than 24% to 75%.")).[5] The stringent standards set in the BRA, as interpreted by the Supreme Court, recognize that any amount of time that a person is locked behind bars is significant, especially when the person has not been convicted of an offense. *See* Mot., ECF No. 14 at 6-7 (discussing the role Mr. Harrison plays in his family); *Abass*, 2025 WL 1096795, at *5 (describing collateral consequences of incarceration).

---

https://www.uscourts.gov/sites/default/files/2025-01/jb_h15_0930.2024.pdf (last visited July 28, 2025); *see also CREW v. Trump*, 924 F.3d 602, 607 (D.C. Cir. 2019) (public records can be judicially noticed).

[5] As the Supreme Court has observed, the vast majority of criminal cases, approximately 97% in federal court, result in plea deals and do not go to trial. *See, e.g.*, *Missouri v. Frye*, 566 U.S. 134, 143 (2012).

## B. Title 18 U.S.C. § 3142(g) Factors

The government argued, *see* Opp'n, ECF No. 15 at 9-15; and the magistrate judge agreed, *see* Add. to Detention Order, ECF No. 17-1; that all four § 3142(g) factors weighed in favor of detention. As explained below, the Court disagreed and held at the July 14, 2025 Hearing that the government failed to meet its burden to show by clear and convincing evidence that no combination of conditions would be sufficient to protect the community; and by a preponderance of the evidence that no conditions could assure Mr. Harrison's appearance. *See* 18 U.S.C. § 3412(f); *Vasquez-Benitez*, 919 F.3d at 551.[6]

### 1. Nature and Circumstances of Offense Charged

The government asserted that the nature and circumstances of the alleged offense weighed in favor of pretrial detention because of the facts it alleged related to the unidentified 911-caller's statement; that the gun recovered from Mr. Harrison was loaded; the presence of the auto-sear device; and because Mr. Harrison was found with suspected narcotics. *See* Opp'n, ECF No.

---

[6] The government's brief, and the magistrate judge's addendum, both focused primarily on the dangerousness question under § 3142, but also based their argument/conclusion on the risk of flight. Because Mr. Harrison has strong ties to the community and a recent history of complying with supervision, the Court concludes that the government has failed to show by a preponderance of the evidence that no conditions can adequately assure his appearance. *See Vasquez-Benitez*, 919 F.3d at 551.

15 at 10–12.[7] In briefing, it primarily focused on the auto-sear device and cited statistics about how these devices that turn guns into automatic weapons have become much more common in the past few years. *See id.* at 11. It also highlighted the "inherent danger associated with loaded guns." *See* Opp'n, ECF No. 15 at 10 (citing *Blackson*, 2023 WL 1778194, at *7-8). At the Hearing, the government played the audio from the 911 call and focused on the allegations in that call as support for its argument that detention is necessary due to the nature of the charged offense. It also highlighted that the gun was loaded and could quickly be used to inflict horrific damage due to the auto-sear device.

In response, Mr. Harrison acknowledged the seriousness of the allegations, especially related to the loaded gun and auto-sear device. But he also highlighted how he is not charged with a violent offense and does not have a history of committing violent offenses. Indeed, Courts have repeatedly held that possession of a firearm is not a crime of violence. *See e.g.*, *United States v. Bryant*, Order, ECF No. 15 in Case No. 25-cr-97 at 2 (citing *United States v. Gloster*, 969 F. Supp. 92 (D.D.C.

---

[7] In its brief, the government argued that Mr. Harrison "created an even greater risk to himself, the community, and the officers involved in his arrest by attempting to prevent the officer from performing a protective pat down and struggling with the officers after the firearm was identified", Opp'n, ECF No. 15 at 12, but did not charge him with any related offense nor rely on this allegation at the July 14, 2025 Hearing.

1997)); *see also United States v. Singleton*, 182 F.3d 7, 15

(D.C. Cir. 1999) (holding that possession of a firearm by a

person previously convicted of a crime punishable by a year or

more of incarceration is not a "crime of violence" under the

BRA).[8] Even though the government alleges that the 911 call

demonstrates that Mr. Harrison was pointing the gun at people

prior to when the police arrived, it has not charged him with

any violent or threatening conduct. *See* Indictment, ECF No. 10.

The Court emphatically agrees that guns, especially loaded

and automatic weapons, pose a significant risk of danger to

communities everywhere. Here, the Court must determine whether

the government has shown by clear and convincing evidence that

no combination of conditions can adequately protect the

community if Mr. Harrison is released. *See* 18 U.S.C. § 3412(f).

When making such an assessment, the Court must keep in mind the

BRA's requirement that pretrial detention be reserved for the

most serious offenses. *See Salerno*, 481 U.S. 755.

---

[8] Congress subsequently amended the BRA in 2006 to permit
pretrial detention for "any felony that is not otherwise a crime
of violence that involves a minor victim or that involves the
possession or use of a firearm or destructive device (as those
terms are defined in section 921), or any other dangerous weapon
. . . ." 18 U.S.C. § 3142(f)(1)(E); Pub. L. No. 109-248, § 216,
120 STAT. 587, 617 (2006). Title 18 U.S.C. § 3142(f)(1)(E) is
the basis for which the government sought detention of Mr.
Harrison. *See* Opp'n, ECF No. 15 at 10.

As Mr. Harrison argued at the July 14, 2025 Hearing, the scene to which police officers arrived on June 15, 2025 featured Mr. Harrison as one of several people standing in an alleyway allegedly with a gun tucked into his waistband. The government does not allege that the officers saw anyone pointing a gun at other people. Nor did the government allege that people appeared afraid or running into their homes, as described in the call. Moreover, there was no indication that a shooting had occurred, nor any other eyewitness account describing the scene reported in the 911 call. If the allegations from the 911 call were substantiated, they would indeed be deeply troubling. But it is also important to note that there are no allegations that any violence resulted from these alleged acts nor any use of the loaded gun and auto-sear device.

What is more persuasively alleged is that the officers recovered the loaded gun, fitted with the auto-sear device with the potential to inflict a tremendous amount of harm, from Mr. Harrison's person. The question is therefore whether the risk that Mr. Harrison could have used an effectively automatic weapon allegedly in his possession shows that no combination of conditions can adequately secure his appearance and the safety of the community while his charge is pending. In answering this question, it is helpful to consider how other judges on this Court have decided similar issues.

Mr. Harrison cited ten cases in which other judges on this Court have released people on conditions notwithstanding the concerning facts related to gun charges alleged against them. *See* Mot., ECF No. 14 at 4 (citing *United States v. Bryant*, Case No. 25-cr-97 (Faruqui, J.) (Bates, J.); *United States v. Abass*, Case No. 25-cr-79 (Faruqui, J.) (Chutkan, J.); *United States v. Gaskins/Gaines*, Case No. 25-cr-39 (Faruqui, J.) (Upadhyaya, J.) (Ali, J.); *United States v. Belton*, No. 25-cr-168 (Sharbaugh, J.) (Boasberg, J.) (McFadden, J.); *United States v. Robinson*, Case No. 24-cr-95 (Faruqui, J.) (Chutkan, J.); *United States v. Yates*, No. 24-cr-89 (Faruqui, J.) (Reyes, J.); *United States v. Griffith*, Case No. 24-cr-56 (Harvey, J.) (Mehta, J.); *United States v. Wiggins*, Case No. 23-cr-109 (Meriweather, J.) (Boasberg, J.); *United States v. Jones*, Case No. 23-cr-154 (Faruqui, J.) (Chutkan, J.); *United States v. Hicks*, Case No. 19-cr-288 (Harvey, J.) (Leon, J.)). In all of these cases, the defendant(s) was charged at a minimum with unlawful possession of a firearm. *See id.* The government sought detention in all of these cases, but the court denied each request and released the defendants with strict conditions. *See id.* In several cases, the government appealed release decisions made by magistrate judges. *See id.* In each case that was appealed, however, the district judge affirmed that the defendant should be released. *See id.* None of the defendants had their release revoked pretrial, and

in several cases, judges modified conditions to be less restrictive upon a defendant's request.

In *United States v. Bryant*, the defendant was charged with one count of violating 18 U.S.C. § 922(g)(1). *See* Indictment, ECF No. 1 in Case No. 25-cr-97. The government sought pre-trial detention, arguing that the defendant had "numerous significant felony convictions" that included carjacking, attempted robbery, and illegal possession of a firearm. *See* Mem. in Support of Pretrial Detention, ECF No. 6 in Case No. 25-cr-97. The government alleged that after receiving a tip from an unknown person about someone possessing a gun, officers observed the defendant pull a firearm out of his front waistband and hand it to another person in a crowd. *See id.* The magistrate judge ordered the defendant released on conditions. *See* Minute Entry (Apr. 15, 2025). The government appealed, and the district judge agreed with the magistrate judge that the defendant should be released on conditions pending trial. *See* Order, ECF No. 15 in Case No. 25-cr-97. The case is still pending, and the defendant remains released on conditions. *See generally* Dkt. in Case No. 25-cr-97.

In *United States v. Abass*, Case No. 25-cr-79, the defendant was charged with one count of violating 18 U.S.C. § 922(g)(1). *See* Indictment, ECF No. 1 in Case No. 25-cr-79. The government sought pre-trial detention and alleged that when the defendant

20

exited a vehicle and ran from police, he dropped a gun to the ground. *See generally* Mem. in Support of Pretrial Detention, ECF No. 6 in Case No. 25-cr-79. The government also alleged that the defendant was found with suspected narcotics. *See id.* The magistrate judge who conducted the detention hearing denied the government's request and released the defendant on conditions. *See* Minute Entry (Apr. 11, 2025) in Case No. 25-cr-79. The government sought emergency review of the release decision, but the district judge affirmed the defendant's release. *See* Minute Entry (Apr. 14, 2025) in Case No. 25-cr-79. The defendant's case is still pending, the defendant remains released on conditions, and the district judge has since granted his request to modify his conditions of release to permit him to go to work. *See generally* Dkt. in Case No. 25-cr-79.

In *United States v. Gaskins/Gaines*, two defendants were each charged with violating 18 U.S.C. § 922(g)(1). *See* Indictment, ECF No. 12 in Case No. 25-cr-39. The government sought pretrial detention of both defendants and alleged that while police officers were on routine patrol, they saw the defendants attempting to gain entry into a building and then run down an ally when they saw the officers. *See* Mem. in Supp. of Pretrial Detention, ECF No. 16 in Case No. 25-cr-39; Mem. in Supp. of Pretrial Detention, ECF No. 17 in Case No. 25-cr-39. The officers alleged that they saw both defendants throw guns

while fleeing, which they later allegedly matched to the defendants using DNA and other evidence. *See* Mem. in Supp. of Pretrial Detention, ECF No. 16 in Case No. 25-cr-39. Both defendants had recent arrests and convictions. *See id.*; Mem. in Supp. of Pretrial Detention, ECF No. 17 in Case No. 25-cr-39. Both magistrate judges who considered whether to release or detain the defendants pretrial ultimately decided to release them. *See* Minute Order (Feb. 19, 2025) in Case No. 25-cr-39; Minute Order (Mar. 6, 2025). The government appealed, and the district judge affirmed the magistrate judges' decisions to release the defendants on conditions. *See* Minute Order (Feb. 28, 2025) in Case No. 25-cr-39; Minute Order (Mar. 10, 2025) in Case No. 25-cr-39. Both defendants' cases are pending, and they both appear to remain in compliance with their conditions of release. *See generally* Dkt. in Case No. 25-cr-39.

In *United States v. Belton*, the defendant was charged with violating 18 U.S.C. 922(g)(1) and 21 U.S.C. §§ 841(a)(1), (b)(1)(C) (possession with intent to distribute). *See* Information, ECF No. 17 in Case No. 25-cr-168. The government sought to detain the defendant pre-trial and alleged that police officers observed the defendant while on patrol, and once he noticed the officers, the defendant ran away while holding his waistband. *See* Mem. in Support of Pretrial Detention, ECF No. 5 in Case No. 25-cr-168. The officers allegedly observed the

defendant throw a gun while running away and they recovered
sizable quantities of a cocaine-based substance and suspected
fentanyl from the defendant after his arrest. *See id.* The
defendant was initially also charged with violating 18 U.S.C. §
924(c)(1)(A)(i), Using, Carrying, and Possessing a Firearm
During, in Relation to, and in Furtherance of a Drug Trafficking
Offense, which carries a rebuttable presumption of detention.
*See id.*[9] Nevertheless, the magistrate judge reviewing the
detention request concluded that the defendant had rebutted the
statutory presumption. *See* Minute Order (Mar. 28, 2025) in Case
No. 25-cr-168. The government appealed this decision and sought
to stay the release order, and the Chief Judge for this Court
affirmed the Magistrate Judge's release order. *See* Minute Entry
(Mar. 31, 2025). The defendant's case is still pending, and he
remains released on conditions. *See generally* Dkt. in Case No.
25-cr-168.

    In *United States v. Robinson*, the defendant was charged
with one count of violating 18 U.S.C. § 922(g)(1). *See*
Indictment, ECF No. 11 in Case No. 24-cr-95. The government
sought pre-trial detention and alleged that the defendant fled
from police while carrying a loaded firearm and then threw the

---

[9] The government initially included the 18 U.S.C. §
924(c)(1)(A)(i) charge in the defendant's Complaint, but did not
include this charge in the Information, which was obtained after
the detention hearing.

firearm into an active street. *See* Mem. in Support of Pretrial
Detention, ECF No. 6 in Case No. 24-cr-95. At the time, the
defendant was on supervised probation following two convictions
for assault with a dangerous weapon and carrying a pistol
without a license. *See id.* The defendant also tested positive
for fentanyl while previously on supervised release. *See id.* The
magistrate judge released the defendant on conditions, and the
government indicated that it would appeal but withdrew its
appeal of the magistrate judge's decision. *See* Minute Entries
(Feb. 15, 2024) in Case No. 24-cr-95. The defendant's case is
now closed, but his supervised release was not revoked during
its pendency; rather, it was modified at certain points to be
less restrictive. *See generally* Dkt. in Case No. 24-cr-95.

In *United States v. Yates*, the defendant was charged with
one count of violating 21 U.S.C. § 841(a)(1), (b)(1)(C)
(possession with intent to distribute cocaine); and one count of
violating 18 U.S.C. § 924(c)(1)(B)(ii) (using, carrying, and
possessing a machinegun in furtherance of a drug trafficking
offense). *See* Indictment, ECF No. 1 in Case No. 24-cr-89. The
government alleged that officers recovered a loaded handgun with
a conversion device to make it a machinegun and an extended
twenty-two round capacity magazine with eighteen additional
rounds of ammunition from the defendant's person. *See* Emergency
Mot. for *De Novo* Review of Magistrate's Release Order, ECF No. 7

in Case No. 24-cr-89. The government sought pre-trial detention,
but the magistrate judge released the defendant on conditions.
*See* Minute Order (Apr. 15, 2024) in Case No. 24-cr-89. The
government sought emergency review and to stay the magistrate
judge's release order, arguing that there were two rebuttable
presumptions of detention which could not be overcome. *See*
Emergency Mot. for *De Novo* Review of Magistrate's Release Order,
ECF No. 7 in Case No. 24-cr-89. The district judge agreed with
the magistrate judge that the defendant should be released on
conditions. *See* Minute Order (Apr. 16, 2024) in Case No. 24-cr-
89. The government ultimately dismissed the case, but during its
pendency, the court did not revoke the defendant's release. *See*
Consent Mot. to Dismiss, ECF No. 29 in Case No. 24-cr-89.

In *United States v. Griffith*, the defendant was charged
with one count of violating 18 U.S.C. § 922(g)(1). *See*
Indictment, ECF No. 1 in Case No. 24-cr-56. The government
sought pre-trial detention, highlighting how the defendant had
four prior convictions, including one for attempted robbery. *See*
Mem. in Supp. of Pretrial Detention, ECF No. 8 in Case No. 24-
cr-56. The government alleged that officers had observed the
defendant standing in a pavilion in a playground, run away when
officers approached, and then found a gun on the ground near the
playground where the defendant previously had been. *See id.* The
magistrate judge who reviewed the detention request released the

25

defendant on conditions. *See* Minute Entry (Feb. 9, 2024) in Case
No. 24-cr-56. The case is now closed, but the defendant's
release was not revoked during its pendency. *See generally* Dkt.
in Case No. 24-cr-56.

In *United States v. Wiggins*, the defendant was charged with
one count of violating 18 U.S.C. § 922(g)(1); one count of
violating 21 U.S.C. § 841(a)(1), (b)(1)(C) (possession with
intent to distribute cocaine); one count of violating 21 U.S.C.
806(a) (possession with intent to distribute cocaine within
1,000 feet of a school); and one count of violating 18 U.S.C. §
924(c)(1)(A)(i) (possession of a firearm during a drug
trafficking offense). *See* Indictment, ECF No. 1 in Case No. 23-
cr-109.[10] The government alleged that the defendant possessed a
machinegun while attempting to distribute narcotics and had
engaged officers in a high-speed chase, crashed his car, then
attempted to flee. *See* Mem. in Supp. of Pretrial Detention, ECF
No. 7 in Case No. 23-cr-109. The government sought pretrial
detention and alleged, *inter alia*, that there were two
rebuttable presumptions of detention. *See id.* The magistrate
judge denied the government's request for detention and released
the defendant on conditions. *See* Minute Entry (May 26, 2023) in

---

[10] The government ultimately obtained a Superseding Information
that charged the defendant with only one count of violating 18
U.S.C. § 922(g)(1), to which the defendant pled guilty. *See*
Superseding Information, ECF No. 18 in Case No. 23-cr-109.

Case No. 23-cr-109. The case is now closed, but the defendant's release was not revoked during its pendency. *See generally* Dkt. in Case No. 23-cr-109.

In *United States v. Jones*, the defendant was charged with one count of violating 18 U.S.C. § 922(g)(1). *See* Indictment, ECF No. 1 in Case No. 23-cr-154. The government sought detention, *see* Oral Mot. (May 11, 2023), and the magistrate judge denied the government's motion and released the defendant on conditions. *See* Minute Entry (May 16, 2023). The government ultimately dismissed the case, *see* Mot. to Dismiss, ECF No. 46 in Case No. 23-cr-154, but during the case's pendency, the defendant's release was not revoked, and instead it was modified on several occasions to provide less restrictive conditions, *see generally* Dkt. in Case No. 23-cr-154.

In *United States v. Hicks*, the defendant was charged with one count of violating 18 U.S.C. § 922(g)(1) and one count of violating 21 U.S.C. § 844(a) (simple possession of a controlled substance). *See* Indictment, ECF No. 6 in Case No. 19-cr-288. The government sought pre-trial detention, arguing that the defendant fled from police, dropped a loaded firearm while fleeing, then picked up the firearm and threw it into a grassy area. *See* Mem. in Supp. of Pretrial Detention, ECF No. 5 in Case No. 19-cr-288. The officers also allegedly found a cocaine-based substance on the defendant. *See id.* The magistrate judge denied

27

the government's motion and released the defendant on
conditions. *See* Minute Entry (Aug. 29, 2019) in Case No. 19-cr-
288. The case is now closed, but during its pendency, the
defendant's release was not revoked. *See generally* Dkt. in Case
No. 19-cr-288.[11]

To summarize, many of these cases involved factual
allegations that the defendant fled from police and, while doing
so, dropped or threw a gun away from them, sometimes into busy
areas and even once next to a playground. In two of the cases,
the government alleged that the defendant possessed a gun that
was outfitted with a device to turn it into an automatic weapon.
*See* Emergency Mot. for *De Novo* Review of Magistrate's Release
Order, ECF No. 7 in Case No. 24-cr-89; Mem. in Supp. of Pretrial
Detention, ECF No. 7 in Case No. 23-cr-109. In both of those
cases, the defendants faced charges including those related to
possession of a firearm or machine gun during a drug trafficking
offense. In both cases, the government argued that there was a
rebuttable presumption of detention, but the court still
released the defendants on conditions which were not revoked
during the case's pendency.

---

[11] After completing his term of incarceration, the defendant
successfully completed the Court's Re-Entry Program on January
18, 2024. *See* Minute Entry (Jan. 18, 2024) in Case No. 19-cr-
288.

The government does not address these cases in its written submission, but attempted at the Hearing to distinguish gun charges in cases where individuals were allegedly found with a gun, ran from the police, and threw the gun while fleeing from the allegations at issue here regarding the auto-sear device and the 911 call. But even with this distinction, the government did not address cases in which a defendant was alleged to have an enhancement that would turn a gun into an automatic weapon and was still released. In its brief, the government cited a case where another judge on this court recognized the inherent dangerousness of guns, but it did not argue how the facts of that case compared to those alleged in this case beyond that inherent dangerousness. *See* Opp'n, ECF No. 15 at 10-11 (citing *Blackson*, 2023 WL 1778194, at *7-8).

In deciding that this factor weighed in favor of detention, the magistrate judge recited the facts alleged in the government's Motion for Pretrial Detention, noting the penalty Mr. Harrison faces if convicted and the allegations in the 911 call. *See* Add. To Detention Order, ECF No. 17-1 at 2; Gov't Mem. in Support of Pretrial Detention, ECF No. 5 at 2-8; Opp'n, ECF No. 15 at 2-9.[12] The magistrate judge agreed with the government

---

[12] The government's Opposition to Mr. Harrison's Motion was nearly identical to its prior Memorandum in Support of its Motion for Pretrial Detention. *Compare* Mem. in Support of Pretrial Detention, ECF No. 5, *with* Opp'n, ECF No. 15.

that this was "not . . . a mere possessory offense", but did not
elaborate on her rejection of Mr. Harrison's arguments; address
the scene to which officers arrived; consider any of the cases
that Mr. Harrison cited; nor address the fact that Mr. Harrison
has not been charged with any conduct beyond allegedly
possessing a firearm. *See* Add. To Detention Order, ECF No. 17-1;
*see also* Opp'n, ECF No. 15 at 12.

Viewed in the context that the Court described above,
however, the government has failed to show by clear and
convincing evidence that the nature and circumstances of the
alleged offense require pretrial detention. Accordingly, the
Court concludes that this factor weighs in favor of release. In
reaching this conclusion, the Court again emphasizes the severe
risk that guns, particularly automatic weapons, pose. For this
reason, the Court imposed strict conditions of release, which
include home-detention with electronic monitoring.

### 2. Weight of the Evidence

The magistrate judge determined that the weight of the
evidence of Mr. Harrison's possession of the gun, including the
auto-sear attachment, and additional ammunition was strong. *See*

---

Similarly, Mr. Harrison's Motion was practically identical to
his prior Motion for Release and Opposition to the government's
Motion for Pretrial Detention. *Compare* Def.'s Mot. for Release &
Opp'n to Gov'ts Mot. for Pretrial Detention, ECF No. 6; *with*
Mot., ECF No. 14.

Add. to Detention Order, ECF No. 17-1 at 3. This Court agrees that the weight of the evidence as to the charged offense is relatively strong. Although this Court did not receive any live testimony, the government alleges that the gun with the auto-sear device and extra rounds were recovered from Mr. Harrison's person and submitted screenshots of body-worn camera footage supporting this allegation. *See* Opp'n, ECF No. 15 at 3-4.

Even though Mr. Harrison did not concede that the weight of the evidence of the charged offense is strong, he argued that this factor alone cannot be dispositive, *see* Mot., ECF No. 14 at 5; and that the evidence supporting uncharged allegations by the government is weak. The magistrate judge did not consider the reliability or strength of the evidence of the uncharged allegations. *See* Add. to Detention Order, ECF No. 17-1.

On the second issue, this Court agrees with Mr. Harrison that the evidence with respect to the other factual allegations that the government made is less persuasive. First, in its brief, the government alleged that police officers found "suspected narcotics" on Mr. Harrison as part of a search incident to arrest. *See id.* at 6-7. But, as reiterated at the July 14, 2025 Hearing, the government has not confirmed whether these substances were indeed unlawful narcotics. The government also confirmed at the Hearing that it has not charged Mr. Harrison with any offense related to his possession of these

items. Therefore, the Court gives little weight to the government's arguments that it should consider the presence of alleged drugs as part of this offense.[13]

Second, the government confirmed at the July 14, 2025 Hearing that there is no evidence tying Mr. Harrison to the February 17, 2024 incident where police officers found evidence that shots were fired from the gun that was allegedly found on Mr. Harrison more than a year later. The Court does not give this allegation of the gun's involvement in the February 17, 2024 incident any weight here.

Third, Mr. Harrison argued at the July 14, 2025 Hearing that the Court should view the allegations from the 911 call on June 15, 2025 in the context of its unsubstantiated source and whether it comports with the scene to which officers arrived shortly after the call was placed. On the first issue, Mr. Harrison argued that because the government has not identified the caller nor verified their account of events, the call has questionable credibility. On the second, Mr. Harrison argued that the chaotic scene of people running into their homes due to a person pointing a gun was not the scene to which the officers arrived. The officers arrived around 6:15 p.m., shortly after

_____

[13] At the Hearing, it was also mentioned that Mr. Harrison was not alleged to have been using narcotics at the time of his arrest. *See also* Pretrial Servs. Report, ECF No. 4 at 2.

the 911 call was received. *See* Opp'n, ECF No. 15 at 3.
Screenshots from body-worn camera footage when the officers
arrived showed people standing around in the alleyway and one
woman sitting on a front porch, which is a sharp departure from
the description of people running scared into their homes. *See
id.* (government's screenshot upon police arrival). The
government did not respond to these arguments at the Hearing.
The Court therefore concludes that the evidence from the 911
call, which is the basis for the government's allegation that
Mr. Harrison was pointing the gun at people, is relatively week.

It is important to clarify the impact of these conclusions.
Because the allegations related to suspected narcotics, the
gun's history, and the 911 call are not required for Mr.
Harrison's § 922(g)(1) charge, the Court's conclusion that the
evidence of these allegations is relatively weak does not alter
the Court's other conclusion that evidence of the alleged §
922(g)(1) charge is relatively strong and weighs in favor of
detention.[14] It does, however, have some bearing on how the Court
evaluates the government's arguments about Mr. Harrison's

---

[14] As the government highlighted at the Hearing, courts have also
previously noted that the weight of the evidence may heighten
the risk of flight. *See* Opp'n, ECF No. 15 at 12–13 (citing
*Blackson*, 2023 WL 1778194, at *10). But the government has not
pressed this argument further, and the Court does not conclude
that the strength of the evidence for the charged offense poses
a risk that Mr. Harrison will fail to appear that is unmitigable
by strict conditions.

alleged dangerousness. Despite the Court's conclusion with respect to this factor, it continues to evaluate Mr. Harrison's case consistent with the presumption of innocence. *See* 18 U.S.C. § 3142(j) ("Nothing in this section shall be construed as modifying or limiting the presumption of innocence.").

### 3. History and Characteristics

When considering the history and characteristics of the accused, a court shall take into account both:

> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law.

18 U.S.C. § 3142(g)(3)(A)-(B). Here, both sub-factors weigh in favor of release.

The government argued that this factor weighed in favor of detention due to Mr. Harrison's 2011 and 2012 offenses and failure to appear at court as well as his Maryland conviction in 2014-2015. It did not address the other aspects of his history and characteristics including his family support, ties to the District of Columbia, nor participation in the Pathways Program.

Mr. Harrison argued that the Court should consider his
entire history. *See* Mot., ECF No. 14 at 5-7. Although Mr.
Harrison's history includes the failures to appear in 2011 and
2012, he points out that it also includes his compliance with
supervision related to his 2014-2015 offense in Maryland and
while his ultimately-dismissed charge in D.C. Superior Court was
pending from 2017-2022. *See id.* Moreover, Mr. Harrison
highlights how he has had no convictions in the past decade and
that his prior convictions were relatively minor, non-violent
offenses. *See id.* He also argued that he has strong family
support, *see* Letters of Support, ECF No. 6-1, 6-2, & 6-3; life-
long ties to the District of Columbia area; and a new job offer.

The magistrate judge determined that Mr. Harrison's history
and characteristics "weigh[] heavily in favor of pretrial
detention" and predominately relied on Mr. Harrison's offenses
in 2011, 2012, and 2014-2015. Add. to Detention Order, ECF No.
17-1 at 3. The magistrate judge briefly acknowledged Mr.
Harrison's support from his family, but concluded, presumably
based on the 2011-2012 incidents, that she had "no confidence"
Mr. Harrison would comply with conditions if released. *Id.* at 4.

As the Court noted at the July 14, 2025 Hearing, the 2011-
2012 offenses and instances in which Mr. Harrison failed to
appear or comply with supervision occurred when Mr. Harrison was
a teenager or emerging adult (18-20 years old), now at least

twelve years ago.[15] When the Court asked the government at the
Hearing why it should not look at Mr. Harrison's more recent
history of complying with supervision related to his 2014-2015
conviction in Maryland and 2017-2022 dismissed charge in D.C.
Superior Court, the government had no answer. It simply
reiterated its view on the seriousness of the alleged offense.
Nor did the magistrate judge's detention decision account for
this more recent history of compliance with supervision. *See*
Add. to Detention Order, ECF No. 17-1. Accordingly, even though
Mr. Harrison's past instances of non-appearance and non-
compliance are concerning, they must be considered in light of
his more recent history of success on supervision. *See also*
*Munchel*, 991 F.3d at 1280-81. Moreover, Mr. Harrison highlighted
at the July 14, 2025 Hearing that he has no history of
committing violent offenses, an aspect of his record that the
magistrate judge also failed to address.[16]

---

[15] The District of Columbia has recognized the distinction
between children and emerging adults as opposed to older
offenders. *See e.g.*, Incarceration Reduction Amend. Act, D.C.
Code § 24-403.03(c)(10) (directing courts to consider at
resentencing "[t]he diminished culpability of juveniles and
persons under age 25, as compared to that of older adults, and
the hallmark features of youth, including immaturity,
impetuosity, and failure to appreciate risks and consequences").
[16] On the contrary, the magistrate judge posited that "Mr.
Harrison might have been involved in other violent altercations,
where the firearm he possessed in this case was discharged in a
residential area at least 3 times on February 17, 2024." Add. to
Detention Order, ECF No. 17-1 at 3-4. But Mr. Harrison was not
charged with any related offense; rather, the government

Moreover, Mr. Harrison highlighted his close family ties; engagement in the Pathways Program; and willingness to obtain mentorship services from Mr. Vincent Massey as further evidence of his history and characteristics that weigh in favor of pretrial release. Members of Mr. Harrison's family attended the July 14, 2025 Hearing and the Court remarked upon the importance of Mr. Harrison having his family's support, which it cautioned Mr. Harrison not to take for granted. Further, Mr. Harrison's counsel represented that Mr. Harrison was offered employment set to begin on July 21, 2025. This employment offer, in addition to Mr. Harrison's successful engagement in the Pathways Program, demonstrate his potential and efforts to change his path.

Finally, Mr. Harrison agreed to seek mentorship services from Mr. Massey. The Court ordered Mr. Harrison to seek these services as a condition of his release and warned that a failure to do so could lead to revocation. At the Hearing, the Court heard from Mr. Massey about the mentorship that he is willing to provide to Mr. Harrison; how his mentorship has supported successful compliance with supervision in other cases[17]; and how

---

conceded that it does not allege Mr. Harrison was involved in this incident. This incident has no bearing on the Court's analysis.

[17] According to Mr. Massey, he has assisted approximately fifteen returning citizens who are in this court's Re-Entry Court and attempting to successfully reintegrate after serving sentences of incarceration. In total, Mr. Massey has provided guidance and support to "300+ [h]igh risk individuals and violent

he plans to support Mr. Harrison as he prepares to begin his new job and comply with his other conditions of release. The Court recognized Mr. Massey's significant contribution to public service and safety by supporting individuals who are involved in the criminal legal system and attempting to chart a better path forward.

In summary, Mr. Harrison's strong record of appearing for court and complying with supervision since his 2011 and 2012 offenses, which the government conceded at the July 14, 2025 Hearing; non-violent and remote criminal history; strong family and community ties; and record of engaging in and willingness to continue to engage in programs and opportunities to secure employment and other ways to mitigate the risk of unlawful conduct lead the Court to conclude that strict conditions of release can adequately mitigate his risk of flight and danger to the community. Accordingly, this factor weighs strongly in favor of release.

### 4. Nature and Seriousness of Danger if Released

Both the government and Mr. Harrison agree that the fourth factor requires a forward-looking analysis of whether there is a specific, articulable threat that cannot be mitigated by

---

offenders[.]" WHAT A CHANGE, MASSEY MENTORING, INC., https://www.whatachange.org/vincent-m-v (last visited July 28, 2025).

conditions. *See* Opp'n, ECF No. 15 at 14–15 (citing *Munchel*, 991 F.3d at 1280; *United States v. Hale-Cusanelli*, 3 F.4th 449, 456 (D.C. Cir. 2021)); Mot., ECF No. 14 at 8 (citing *Munchel*, 991 F.3d at 1286 (Katsas, J., concurring)). The D.C. Circuit has recently articulated the required analysis:

> Thus, a defendant's detention based on dangerousness accords with due process only insofar as the district court determined that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety.

*Munchel*, 991 F.3d 1280; *see also id.* (quoting *Salerno*, 418 U.S. at 751) (alteration & emphasis in original) ("In *Salerno*, the Supreme Court rejected a challenge to this preventive detention scheme as repugnant to due process and the presumption of innocence, holding that '[w]hen the Government proves by clear and convincing evidence that an arrestee *presents an identified and articulable threat* to an individual or the community, we believe that, consistent with the Due Process Clause, a court may disable the arrestee *from executing that threat*.'"). The question is therefore whether the government has shown that Mr. Harrison poses an "identified and articulable threat" to the community that cannot be adequately mitigated if he is released. *Id.* at 1282.

In its briefing, the government pointed to the "history of the gun found in [Mr.] Harrison's waistband"; Mr. "Harrison's

wielding of a loaded firearm modified to act as a machinegun, and pointing it at people in the neighborhood"; and Mr. "Harrison's possession of suspected narcotics" as "demonstrat[ing] and "heighten[ing] the danger [Mr.] Harrison poses to our community." Opp'n, ECF No. 15 at 15. It made the same argument at the Hearing. The magistrate judge similarly relied on the "history of the firearm found in Mr. Harrison's waistband", including its origin and the 2024 incident; as well as the allegations in the 911 call; the auto-sear device and loaded gun; and the "suspected narcotics" to conclude that this factor weighed in favor of detention. *See* Add. to Detention Order, ECF No. 17-1 at 4.

Mr. Harrison argued that the government "has not and cannot provide specific evidence to support a finding that [he] currently poses an unmitigable threat to public safety"; and that "safety can be assured by stringent conditions of release." Mot., ECF No. 14 at 8. The Court agrees.

As previously noted, Mr. Harrison's counsel persuasively argued at the Hearing that the evidence with respect to the gun's history, 911 call, and suspected narcotics is relatively weak. The government conceded that there are no facts or evidence to support that Mr. Harrison was previously involved in the gun's history. It also conceded that it had not charged Mr. Harrison with any drug-related offenses, and that it still has

40

not confirmed whether the substances allegedly found on Mr. Harrison were unlawful narcotics. As for the 911 call, the government did not contest Mr. Harrison's arguments about its reliability or alleged inconsistencies with the scene to which the police officers arrived; nor did it assert that there has been any further verification of the call's contents. Even if the Court were to credit these allegations, the government has not demonstrated how the risk posed from the conduct alleged cannot be adequately mitigated by strict conditions.

The government did not argue that Mr. Harrison's alleged possession of the loaded auto-sear equipped gun by itself is a specific, identifiable threat that cannot be mitigated by strict conditions. *See* Opp'n, ECF No. 15 at 15. Nevertheless, the Court concludes that stringent conditions could mitigate the risk posed by Mr. Harrison's alleged possession of this gun. Therefore, this factor weighs in favor of release.

For all these reasons, the Court holds that the first, third, and fourth 18 U.S.C. § 3142(g) factors weigh in favor of Mr. Harrison's pretrial release and that the strict conditions that the Court imposed will adequately protect against the risk of flight and danger to the community.

## C. Conditions

At the July 14, 2025 Hearing, the Court adopted the conditions that Pretrial recommended in addition to the requirement that Mr. Harrison obtain mentorship services from Mr. Massey. The conditions that the Court imposed are that Mr. Harrison must:

- Submit to supervision by and report for supervision to the Pretrial Services Agency, Washington D.C.;

- Continue or actively seek employment;

- Surrender any passport to Pretrial;

- Not obtain any passport or other international travel document;

- Not possess a firearm, destructive device, or other weapons;

- Not use or unlawfully possess a narcotic drug or other controlled substances defined in 21 U.S.C. § 802, unless prescribed by a licensed medical practitioner;

- Submit to testing for a prohibited substances, if required by the Pretrial office or supervising officer;

- Participate in location monitoring with Home Detention and submit to GPS-location monitoring;

- Timely report any contact with law enforcement to Pretrial; and

- Maintain weekly contact with Mr. Vincent Massey.

*See* Conditions of Release, ECF No. 18. The Court subsequently ordered Mr. Harrison to participate in bi-weekly status hearings with Magistrate Judge Faruqui to discuss Mr. Harrison's

42

compliance with supervision and aid in addressing any challenges that may arise. *See* Minute Order (July 16, 2025). The next hearing before Magistrate Judge Faruqui is set to occur on July 29, 2025. *See* Minute Order (July 18, 2025).

### IV.  Conclusion

For the reasons explained at the July 14, 2025 Hearing and memorialized above, the Court **GRANTED** Mr. Harrison's Motion for Reconsideration and Pretrial Release, ECF No. 14, and ordered Mr. Harrison released on conditions.

**SO ORDERED.**

**Signed:      Emmet G. Sullivan
            United States District Judge
            July 28, 2025**